UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

RODERICK OPALEC,

    Petitioner,

    v.

BEN CURRY, warden,

    Respondent.
                                 /

No. C 06-6459 MHP (pr)

**ORDER GRANTING HABEAS PETITION**

## INTRODUCTION

Roderick Opalec, a prisoner at the Correctional Training Facility in Soledad, filed this pro se action for a writ of habeas corpus under 28 U.S.C. § 2254 to challenge the parole board's 2005 decision that he was not suitable for parole. After about 14 years of incarceration during which he continuously has exhibited exemplary behavior, Opalec's crime does not provide sufficient evidence to support the parole board's decision that he is currently unsuitable for parole. The petition will be granted.

## BACKGROUND

Roderick Opalec was convicted in 1990 in Los Angeles County Superior Court of attempted murder and was sentenced in 1992 to a term of life plus 3 years plus 3 years in prison. His habeas petition does not concern that conviction directly, but instead focuses on the January 28, 2005 decision by the Board of Parole Hearings ("BPH") to find him not suitable for parole. This was Opalec's third parole consideration hearing, and came more than five years after his October 10, 1999 minimum eligible parole date. (Opalec asserts and respondent does not dispute that the parole eligibility for an indeterminate life sentence for an attempted murder generally is 7 years, so that – like the 15-to-life sentence for second

degree murder – the attempted murder sentence is often considered a 7-to-life sentence.)

The specifics regarding the crime and the circumstances regarding parole suitability are described in the Discussion section later in this order and are only mentioned here in brief. In 1990, Opalec was in a street gang and shot at someone twice from a car in retaliation for an attack two days earlier on someone in his gang. No one was hit by either of the bullets fired from his gun. He was convicted of attempted murder. Before this crime, he had an insignificant criminal record and some drug usage. What really jumps out at the reader is that, although Opalec went in to prison at an age and with a background that probably made continued misconduct and gang affiliation likely, he has done a 180-degree turn with his life. He has avoided drugs, alcohol and gangs in prison. He has had zero disciplinary problems in prison, has upgraded educationally and vocationally, and has an excellent psychological evaluation. Even the district attorney's opposition to parole was much more subdued than in most cases.

Opalec sought relief in the California courts. The Monterey County Superior Court denied his petition in a short but reasoned order. Resp. Exh. 5. The California Court of Appeal and California Supreme Court summarily denied his petitions. Resp. Exh. 7 and 8.

Opalec then filed his federal petition for writ of habeas corpus, asserting that his right to due process had been violated. Respondent filed an answer. Opalec filed a traverse. The matter is now ready for a decision on the merits.

**JURISDICTION AND VENUE**

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged action occurred at the Correctional Training Facility in Soledad. Soledad is in Monterey County and within this judicial district. 28 U.S.C. §§ 84, 2241(d).

**EXHAUSTION**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the

highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claims asserted in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000). Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole. See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

## DISCUSSION

A.   Due Process Requires That Some Evidence Support A Parole Denial

A California prisoner with a sentence of a term of years to life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability proceedings. See Sass, 461 F.3d at 1127-28; Board of Pardons v. Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1 (1979); Cal. Penal Code § 3041(b).

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision. Sass, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)). "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the

1  evidence. Instead, the relevant question is whether there is any evidence in the record that
2  could support the conclusion reached'" by the parole board or the governor. <u>Id.</u> at 1128
3  (quoting <u>Superintendent v. Hill</u>, 472 U.S. at 455-56). The "some evidence standard is
4  minimal, and assures that 'the record is not so devoid of evidence that the findings of the . . .
5  board were without support or otherwise arbitrary.'" <u>Id.</u> at 1129 (quoting <u>Superintendent v.</u>
6  <u>Hill</u>, 472 U.S. at 457). The some evidence standard of <u>Superintendent v. Hill</u> is clearly
7  established law in the parole context for purposes of § 2254(d). <u>Sass</u>, 461 F.3d at 1129.

8        Having determined that there is a due process right, and that some evidence is the
9  evidentiary standard for judicial review, the next step is to look to state law because that sets
10 the criteria to which the some evidence standard applies. One must look to state law to
11 answer the question, "'some evidence' of what?"

12 B.  <u>State Law Standards For Parole For Those Who Attempt Murder In California</u>

13       California uses indeterminate sentences for most non-capital murderers and attempted
14 murders, with the term being life imprisonment and parole eligibility after a certain minimum
15 number of years. For example, the minimum period for an attempted murder is 7 years, for
16 second degree murder is 15 years, and for first degree murder is 25 years. <u>See</u> <u>In re</u>
17 <u>Dannenberg</u>, 34 Cal. 4th 1061, 1078 (Cal.), <u>cert. denied</u>, 126 S. Ct. 92 (2005); Cal. Penal
18 Code §§ 190, 664. California's parole scheme described below provides that a release date
19 normally must be set unless various factors exist, but the "unless" qualifier is substantial.

20       A BPH panel meets with an inmate one year before the prisoner's minimum eligible
21 release date "and shall normally set a parole release date. . . . The release date shall be set in a
22 manner that will provide uniform terms for offenses of similar gravity and magnitude in
23 respect to their threat to the public, and that will comply with the sentencing rules that the
24 Judicial Council may issue and any sentencing information relevant to the setting of parole
25 release dates." Cal. Penal Code § 3041(a). Significantly, that statute also provides that the
26 panel "shall set a release date unless it determines that the gravity of the current convicted
27 offense or offenses, or the timing and gravity of current or past convicted offense or offenses,
28 is such that consideration of the public safety requires a more lengthy period of incarceration

4

1  for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal.
2  Penal Code § 3041(b).

3  One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides: "A parole
4  date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A
5  parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A
6  parole date set under this article shall be set in a manner that provides uniform terms for
7  offenses of similar gravity and magnitude with respect to the threat to the public."[1] The
8  regulation also provides that "[t]he panel shall first determine whether the life prisoner is
9  suitable for release on parole. Regardless of the length of time served, a life prisoner shall be
10 found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose
11 an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. §
12 2402(a). The panel may consider all relevant and reliable information available to it. 15 Cal.
13 Code Regs. § 2402(b).

14 The regulations contain a matrix of suggested base terms for several categories of
15 crimes. See 15 Cal. Code Regs. § 2403. For example, for attempted murders, the matrix of
16 base terms ranges from the low of 7, 8, or 9 years to a high of 13, 14, or 15 years, depending
17 on some of the facts of the crime. Some prisoners estimate their time to serve based only on
18 the matrix. However, going straight to the matrix to calculate the sentence puts the cart
19 before the horse because it ignores critical language in the relevant statute and regulations
20 that requires the prisoner first to be found suitable for parole.

21 The statutory scheme places individual suitability for parole above a prisoner's
22 expectancy in early setting of a fixed date designed to ensure term uniformity. Dannenberg,
23 34 Cal. 4th at 1070-71. Under state law, the matrix is not reached unless and until the
24 prisoner is found suitable for parole. Id. at 1070-71; 15 Cal. Code Regs. § 2403(a) ("[t]he
25 panel shall set a base term for each life prisoner who is found suitable for parole"). The
26 California Supreme Court's determination of state law in Dannenberg is binding in this
27 federal habeas action. See Hicks v. Feiock, 485 U.S. 624, 629-30 (1988).
28

5

1    The California Supreme Court also has determined that the facts of the crime can alone support a sentence longer than the statutory minimum even if everything else about the prisoner is laudable. "While the Board must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release." Dannenberg, 34 Cal. 4th at 1071; see also In re Rosenkrantz, 29 Cal. 4th 616, 682-83 (Cal. 2002), cert. denied, 538 U.S. 980 (2003) ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole" but might violate due process "where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense").

The federal habeas court's task is not to determine whether some evidence supports the reasons cited for the denial of parole, "but whether some evidence indicates a parolee's release unreasonably endangers public safety. Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers the public safety." Hayward, 512 F.3d 536, 543 (9th Cir. 2008) (citation omitted).

C.   The BPH's Decision Was Not Supported By Some Evidence

The BPH identified one main reason for its decision that Opalec was not suitable for parole: the commitment offense. The BPH also noted that OPALEC needed to obtain more information about portions of his parole plans, and that the district attorney opposed parole.

1.   The Commitment Offense

The crime was described in the life prisoner evaluation report. On September 24, 1900, Opalec and five other members "of the Long Beach Local Boys, agreed to retaliate against members of the Scott Royal Brothers Gang. The group split up into two vehicles and drove to Carson City, California. Two members of the Scott Royal Brothers were fired upon. . . . The two victims were not killed in the drive-by attack." RT 9-10; Resp. Exh. 2, July 2002 Life Prisoner Evaluation Report, p. 1. This attack was retaliation for an incident two

6

days earlier in which one of Opalec's friends was shot by the members of the rival gang. RT 10. Opalec was one of two gang members who did the shooting. Opalec shot twice at one of the rival gang members but did not hit him. RT 39-40, 45. The second shooter was in another car; he shot twice at another rival and did hit him in the arm and shoulder blade area, but the victim survived. RT 12, 15. (Neither party explains whether the attempted murder conviction was based on shots fired by Opalec or the other gang member.) At the time of the shooting, Opalec was 19 years old and had been in the gang of about 40 members for about two years since shortly after arriving in the U.S. This was the only shooting in which he was involved. RT 13-14.

Opalec explained that, at the time of the shooting he thought it was justified because he was living the gang lifestyle, but now knows it was wrong: "I knew that I had a chance not to go along with the plan or even stop what was going to happen that night, but I didn't. And I'm taking full responsibility of – for what happened. You know, people got hurt, you know." RT 15. Opalec realized that the victim who was shot had experienced pain and that both victims and people they knew were affected because the shooting put fear into them. RT 16. Although he did not think about it at the time, he now realizes innocent bystanders could have been hit by his gunfire. RT 47-48.

While Opalec was in the gang, he used drugs. He used marijuana (i.e., about "a dime bag a week, but not a heavy smoker"), he used methamphetamine on weekends, and he experimented with cocaine for a little bit. RT 17. He did not care much for alcohol. RT 17. Other than the gang shooting, his criminal record consisted of one arrest for burglary that the D.A. rejected for prosecution. RT 19. During the week he worked at two jobs and he lived at his parents' home while he was in the U.S.

In determining that Opalec was not suitable for parole, the BPH stated that the offense "was quite callous," "there were many victims that could have been hit," it was "quite a calculated crime" as is often the case with gang retaliation shootings, it "was carried out in a manner that showed a total disregard for human suffering," and was for an extremely trivial motive. RT 61-62. All of these characterizations were correct, but the existence of some

evidence to support the cited reasons does not end the matter. See Hayward, 512 F.3d at 543.

### 2. Parole Plans

Opalec planned to return to the Philippines once paroled, and had an immigration hold in his file. RT 30-31. He planned to live with his aunt and uncle in the Philippines, and his aunt had offered to hire him to work in her export business, although he did not know specifically what his obligations would be at her business or how much the job would pay. RT 31, 35. He also had an offer to live with his mother and stepfather in Long Beach, who had written that they also could provide financial support for him. 33-34. He did not know about the availability of substance abuse programs in the Philippines. RT 37.

Respondent argues that the BPH's parole denial was based on the need to firm up parole plans. Although Opalec's parole prospects could be enhanced by learning the details of the job offer he had in the Philippines and by learning about substance abuse programs available there, those deficiencies did not support the denial of parole as they did not reflect on whether his release would unreasonably endanger public safety. See Hayward, 512 F.3d at 542. Significantly, Opalec had been participating in the N.A. and A.A. substance abuse programs for at least eight years, so this is not a situation where the inmate has done nothing to deal with substance abuse concerns.

### 3. District Attorney's Opposition

A deputy district attorney from Los Angeles County stated that "the People see Mr. Opalec as truly remorseful. He seems to have understood the dangers that he put innocent people into." RT 51. The D.A. noted, however, that the crimes were "extremely serious" and "but for his bad aim or luck, he would be incarcerated perhaps for the rest of his life on murder charges." RT 51. The D.A. stated that "although the crime is extremely serious, on this particular inmate, I think he's getting close to a parole date, if I may say that." RT 52. The D.A. also thought Opalec should have more contact with the family in the Philippines he intended to live with and should learn about the availability of substance abuse programs for support. RT 52.

Respondent argues that the BPH's parole denial was based on the district attorney's

8

opposition. The district attorney's mere opposition to parole generally does not provide a sufficient ground for denying parole, see Hayward, 512 F.3d at 545 n.9, and the substance of the opposition (i.e., the seriousness of the crime and the need to firm up parole details), has been considered in the discussion of those factors. In any event, the district attorney's opposition was not very vigorous.

    4.    Positive Behavior In Prison

Most remarkably, Opalec had no disciplinary record in his 12 years in prison or in the 2 years he was in the county jail before he went to prison. He had received no CDC-115 rule violation reports and no CDC-128 counselling memoranda. RT 25. Opalec stated he disassociated himself from the gang "[f]rom the minute I stepped in the prison." RT 29-30; see RT 41.

Opalec had worked on educational and vocational skills. He received his GED in 1997. RT 22. He completed two vocational trades (i.e., paint and decoration trade in 2003 and diesel mechanic trade in 1999). RT 22. He had been working in the PIA wood shop since about 2003 and had received excellent work reports. RT 22.

Opalec had done extensive self-help work. He had been in A.A. since at least 1997 and N.A. since at least 1999 (and possibly since 1993). RT 23. He had done two fatherhood programs in 2000 and 2001, FEMA work in 2004, an ongoing Crim-Anon correspondence course, an employability program in August 2004, and an entrepreneur class on salesmanship in 2001. RT 22-25.

His psychological evaluations were very favorable. His 2004 evaluation stated that he was "very insightful" about the crime, understood it was wrong very soon after the crime and there were no other causes that needed exploration. RT 28. With regard to the need for further therapy while incarcerated, the psychologist wrote that Opalec had completed all the therapy he needed to do in prison. RT 28. The psychologist believed that Opalec "would pose a less than average risk for violence" compared to the level II inmate population, and "no more than the average citizen within the community." RT 29. The doctor noted that the only significant risk factor would be the return to drugs or gang affiliation. RT 29.

9

       5.       <u>Consideration of the Crime In Light of Rehabilitation Evidence</u>

A critical issue in parole denial cases concerns the BPH's use of evidence about the crime that led to the conviction. Four Ninth Circuit cases guide the application of the <u>Superintendent v. Hill</u> some evidence standard on this point: <u>Biggs v. Terhune</u>, 334 F.3d 910 (9th Cir. 2003), <u>Sass</u>, 461 F.3d 1123, <u>Irons v. Carey</u>, 479 F.3d 658 (9th Cir. 2007), and <u>Hayward v. Marshall</u>, 512 F.3d 536 (9th Cir. 2008). <u>Biggs</u> explained that the value of the criminal offense fades over time as a predictor of parole suitability: "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . . A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." <u>Biggs</u>, 334 F.3d at 916-17. <u>Biggs</u> upheld the initial denial of a parole date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . . , should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole." <u>Id.</u> at 916. Next came <u>Sass</u>, which criticized the <u>Biggs</u> statements as improper and beyond the scope of the dispute before the court. <u>Sass</u> determined that the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the parole applicant's pre-offense behavior in determining parole suitability. <u>See id.</u> at 1129 (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing). <u>Irons</u> then determined that due process was not violated by the use of the commitment offense and pre-offense criminality to deny parole for a prisoner 16 years into his 17-to-life sentence. <u>Irons</u> emphasized that in all three cases (<u>Irons</u>, <u>Sass</u> and <u>Biggs</u>) in which the court had "held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence." <u>Irons</u>, 479 F.3d at 665. Most recently,

in Hayward, the Ninth Circuit confronted a case where the prisoner was long past his minimum parole date, and had been in custody for 27 actual years on his 15-to-life sentence. Hayward granted habeas relief to the petitioner, relying on Biggs and Irons, and citing with approval In re. Scott, 133 Cal.App.4th 573, 595 (Cal. Ct. App. 2005) for the proposition that the "'commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison.'" Hayward, 512 F.3d at 545.

When the full picture is considered, Opalec's 1990 attempted murder did not provide sufficient evidence to find that his release would unreasonably endanger the public safety in 2005. On the negative side was Opalec's crime. The BPH was correct in describing it as very callous and calculated, done for an extremely trivial motive, done with the potential for many victims, and carried out in a manner that showed a total disregard for human suffering. Gang activities and shootings such as Opalec's rightly deserve condemnation. However, one must also look at the evidence on the positive side. When one does so, it becomes apparent that Opalec's case is the kind of case Biggs and Irons cautioned about: the continued reliance on the immutable events of the crime to deny parole for present dangerousness despite the candidate's exemplary behavior in prison, favorable current psychological reports, and the absence of any other violence or criminal record. Opalec's in-prison behavior was exemplary. He had received no disciplinary rule violation reports and no counseling memos for less serious transgressions. The various vocational, educational and self-help programming he had done was not recent but had been ongoing throughout his incarceration, supporting the view that he has continuously used his incarceration time to rehabilitate himself. Among the listed circumstances tending to show suitability, several were present here: Opalec had no juvenile record or criminal history (save one arrest for which the charges were dismissed). 15 Cal. Code Regs. § 2402(d)(1) & (6). He had a stable social history. § 2042(d)(2). He was remorseful. § 2402(d)(3). And he had made realistic plans for his release and had developed marketable skills. § 2402(d)(8). Lastly, his "[i]nstitutional activities indicate an enhanced ability to function within the law upon release." § 2402(d)(9).

As of the time of the BPH hearing, Opalec had been in custody more than 14 years, as he had been arrested 2 weeks after the shooting, spent about 2 years in county jail, and had been in the California prison system for 12 years.  When he was denied parole in 2005, it was the third time he was found not suitable for parole.

The some evidence standard provides protection against more than fabricated charges or bureaucratic mistakes -- the some evidence standard also protects against arbitrary decisions.  See Superintendent v. Hill, 472 U.S. at 454-55, 457; Hayward, 512 F.3d at 542.  Opalec's commitment offense has been relied on to deny parole notwithstanding the extensive positive evidence: there was unequivocal evidence of continuous good behavior and rehabilitation in prison, there was a complete absence of evidence of any other violent acts by Opalec, there was a complete absence of any other criminal record (save a burglary arrest), and there was an absence of any suggestion of a need for further therapy or self-help type programming by the mental health professional who examined him for the 2005 hearing.  Under these circumstances, the BPH's reliance on the circumstances of the 1990 attempted murder to find Opalec unsuitable for parole did not comport with the some evidence standard.  It violated due process.

The only reasoned decision from a state court is the Monterey County Superior Court's two-paragraph order, that stated that the BPH "may continue to deny an inmate parole based solely on the nature of the commitment offense, so long as the Board's decision is supported by reference to specific facts regarding the commitment offense that show the offense to be particularly violent or callous.  In re Dannenberg (2005) 34 Cal. 4th 1061, 1093-96.  Here, the Board's decision contains a detailed description of Petitioner's commitment offense, which involved a retaliatory gang shooting.  The Board's decision does not constitute an abuse of discretion."  Resp. Exh. 5.  It is unclear whether that court applied the right legal standard, as it mentioned the Dannenberg case but apparently applied an "abuse of discretion" test instead of the "some evidence" test.  The state court's decision was an unreasonable application of Superintendent v. Hill.   Opalec is entitled to relief under the standard of 28 U.S.C. § 2254(d).  Opalec's petition for writ of habeas corpus is granted.

1  E.      Opalec Is Entitled To Have His Term Set

2          Having decided that the petition will be granted, the next issue concerns the proper
3  remedy.  Because Opalec has never been found suitable for parole, the BPH has never moved
4  past the suitability-finding function in California Penal Code § 3041(b) to calculate a term
5  and set a release date as required by § 3041(a).  It is now time to do so.  Within **sixty days** of
6  the date of this order, the BPH must calculate a term for Opalec and set a date for his release
7  in accordance with the requirements of California Penal Code § 3041(a).  This does not
8  necessarily mean that the release date must occur within sixty days of the date of this order,
9  but rather that the BPT must act within that time limit.  Within **seventy days** of the date of
10 this order, respondent must file a notice with the court identifying the date set for Opalec's
11 release.

12         Lastly, the court notes that there apparently is an INS (now known as BICE) detainer
13 letter in Opalec's file.  See Resp. Exh. 2 (Nov. 2000 life prisoner evaluation report) p. 2; RT
14 31.  This order concerns only Opalec's prison term and is not intended to have any effect on
15 the immigration issues he faces.  Therefore, prison authorities and immigration authorities
16 may take whatever steps they normally take when there is an immigration hold for an inmate
17 who receives a parole date.

18                                          **CONCLUSION**

19         For the foregoing reasons, the petition for writ of habeas corpus is granted.  Within
20 **sixty days** of the date of this order, the BPH must calculate a term for Opalec and set a date
21 for his release in accordance with the requirements of California Penal Code § 3041(a).
22 Within **seventy days** of the date of this order, respondent must file and serve a notice of the
23 date set for PETITIONER' release.

24         IT IS SO ORDERED.

25 DATED: March 19, 2008

                                                    _____
26                                                  Marilyn Hall Patel
                                                    United States District Judge
27
28

                                                14

## **NOTE**

1.      The listed circumstances tending to show <u>unsuitability</u> for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and negative institutional behavior.  15 Cal. Code Regs. § 2402(c).  The listed circumstances tending to show <u>suitability</u> for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior.  15 Cal. Code Regs. § 2402(d).